## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

| | | |
|---|---|---|
| BUCKHOLTS STATE BANK, on behalf of itself and all others similarly situated, | § § § | |
| *Plaintiff* | § § | |
| V. | § § | Case No. 1-25-cv-00052 |
| NAVY FEDERAL CREDIT UNION | § § § | |
| *Defendant.* | § § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff, Buckholts State Bank ("Plaintiff" or "Buckholts"), files this Original Class Action Complaint against Defendant, Navy Federal Credit Union ("NFCU"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to its own actions and counsel's investigations, and upon information and belief as to all other matters, as follows:

### NATURE OF THE CASE

1.     Buckholts brings this case individually and on behalf of all others similarly situated ("Class Members") who have suffered losses arising out of check fraud facilitated through Defendant, NFCU. Buckholts became a victim of NFCU and its inadequate "Know Your Customer" procedures after a Buckholts customer wrote a check that was then stolen in the US Mail. NFCU then allowed the check thieves to open a business account at NFCU in the name of the payee on the stolen check. NFCU facilitated the creation of the fraudulent account, then immediately cleared the stolen check via deposit into the fraudulent account on January 10, 2023. NFCU allowed the fraudulent account holder immediate access to the funds for transfer and withdrawal. Neither NFCU nor its customer were entitled to enforce the check because the endorsement on the check was not authorized. Buckholts timely notified NFCU of its error in

1

allowing the fraudulent account to be created, claiming a forged endorsement, and requesting a credit be issued by NFCU to Buckholts. NFCU responded on May 15, 2023 that it had "completed our research for the claim" and was denying the claim.

2.    Buckholts, in order to properly investigate whether it could make any claims against NFCU to recover the funds and to determine the veracity of NFCU's representations to Buckholts in denying the claim, filed a petition under Texas Rule of Civil Procedure 202 to depose NFCU. NFCU fought, obstructed, and delayed the deposition as well as production of documents. In fact, as of the date of this filing, NFCU has not produced all of the documents it was ordered to produce by the State District Court Judge. Nevertheless, Buckholts was able to learn enough about the significant amount of check fraud occurring through NFCU, and how NFCU deflects the losses to others, to bring this lawsuit. Notably, one fact learned from the Rule 202 deposition of NFCU's corporate representative is that when NFCU declined to return the fraudulently obtained funds to Buckholts, NFCU had already determined through its own internal investigation that the NFCU account into which the stolen check was deposited was fraudulent and had closed it.  Buckholts also learned that during the relevant period, hundreds of millions of dollars in fraud were occurring through NFCU via hundreds of fraudulent accounts.  Notably, NFCU has been able to limit its own losses to approximately 1% of the total fraud exposure stemming from its fraudulent accounts.

### PARTIES

3.    Plaintiff, Buckholts, is a financial institution organized and authorized to do business under the laws of the State of Texas, and located at 100 N. 4th Street, Buckholts, Milam County, Texas.

4.    Defendant, NFCU, is a global banking institution headquartered in Virginia, with more than 24,500 employees worldwide, $177 billion in assets, 13.8 million customers, and

numerous locations in Texas, including within the Western District of Texas. NFCU may be served through its registered agent, Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA, 23219 - 4100, USA, or wherever it may be found. Service is requested at this time.

**FACTUAL ALLEGATIONS**

I.    **NFCU'S INSUFFICIENT "KNOW YOUR CUSTOMER" REQUIREMENTS**

5.    Know Your Customer (KYC) is a mandatory and important element in the fight against financial crime, money laundering, and terrorist financing.

6.    Customer Identification (CIP) is a critical part of the KYC process to fight against Business ID theft.

7.    Address verification is a critical part of the KYC process.

8.    NFCU provides both personal and business customer accounts.[1]

9.    NFCU personal accounts are eligible for "current and retired members of the armed forces, immediate military family members, Department of Defense civilians, and more." However, new members are not required to provide documentation showing eligibility for membership.

10.    Business Membership accounts are opened only through an online portal using the member's personal NFCU credentials. There is no requirement that a customer have an account with NFCU for any established amount of time. Rather, personal accounts can be created contemporaneously with business accounts.

---

[1] The customer accounts are referred to internally as "memberships."

11.    Upon information and belief, individuals who conduct bank fraud through NFCU often open fraudulent business accounts days or hours after committing Business ID theft then within hours or days of creating the fraudulent account deposit and withdraw fraudulent checks.

12.    The only requirements for a business account are proof of existence documents and completed NFCU applications.

13.    Proof of existence documents include a Good Standing Certificate from the Secretary of State and Notice from the Internal Revenue Service showing the assignment of an employer identification number.

14.    Upon information and belief, NFCU does not require that the business be in existence for any specified period of time and often businesses registered with a state's Secretary of State for the purpose of committing bank fraud are registered days or hours before application for a NFCU Business Account.

15.    NFCU business applications require certain information, such as the address of the business.

16.    Upon information and belief, NFCU does not verify the listed business address, does not require proof of address, and often Business ID thieves—for the purpose of committing bank fraud—provide incorrect addresses.

17.    In addition, in some cases checks deposited in these newly opened fraudulent business accounts likely predate the existence on the business and include identifying information inconsistent with the fraudulent account.

## II.    NFCU's Acknowledgements

18.     NFCU acknowledges that it is a target for the type of fraud described herein.  NFCU acknowledges that its policies, practices, and procedures with respect to the creation of business accounts and the check fraud are inadequate to stop the kind of fraud involved in this matter.

19.     NFCU acknowledges that the fraud subject of this matter is the same fraud trend seen monthly for years in their operation for "first-party fraud" and "business ID theft accounts."

20.     NFCU knows that criminals share information on the web about how to exploit NFCU.  NFCU is aware that criminal organizations are intentionally exploiting the lax policies of NFCU and sharing that information with other criminals.

21.     NFCU acknowledges that within a single department, the average single check fraud transaction amount is $10,000 and that approximately 19,200 fraudulent checks are transacted annually affecting over 100 downstream banks.  NFCU states that it is not "shocked by that number."

22.     NFCU's business risk policy it to not review checks for fraud unless the check exceeds $25,000.  NFCU is unable to estimate the volume of fraud being facilitated through NFCU for check denominations under $25,000.  NFCU justifies its $25,000 check review threshold by acknowledging there would be "thousands and thousands and thousands" more checks to review. NFCU acknowledges that all it takes to bypass the check review process is for the check value to be less than $25,000.  NFCU acknowledges that the threshold of $25,000 is set due to NFCU resource management and not risk management.

23.     NFCU, armed with this knowledge, states that it is unable to point to a single change in policy, procedure, or practice to prevent the type of fraud that is subject of this petition.

### III. PLAINTIFF SUFFERED FROM NFCU'S PRACTICE OF ALLOWING ITS CUSOMERS TO COMMIT BANK FRAUD

24.     In this case, money was improperly withdrawn from Buckholts. Buckholts' customer, Intex Distributing Co, Inc wrote check number 071628 dated January 6, 2023 in the amount of $16,575.90 payable to M&B Metal Products in Leeds, AL ("**Check**"). The check was stolen in the mail. On January 4, 2023, NFCU then allowed one of its customers to open a Business Account in the name of the payee on the Check. NFCU then allowed its customer to deposit the Check into the fraudulently opened Business Account on January 10, 2023 and the funds were allowed to be transferred, debited, or withdrawn starting that same day. NFCU allowed the deposit of a stolen check dated the same day as the creation of the fraudulent business entity.

25.     The check was accepted for deposit by NFCU. NFCU then made representations and warranties to Buckholts about the Check. Buckholts paid the Check based on NFCU's representations and warranties, and Buckholts reasonably expected that NFCU fully complied with Know Your Customer and AMC rules and regulations. Buckholts made multiple requests to NFCU for return of the funds improperly withdrawn and transferred to NFCU's customer through depositing the Check into the fraudulently opened NFCU account. Neither NFCU nor NFCU's customer had any right to the proceeds from the Check. NFCU's internal investigation determined that the account was fraudulent prior to Buckholts making its claim for reimbursement. NFCU is obligated to pay Buckholts the entire amount of the Check, and there is no reason why NFCU has not already returned the full amount of the transacted check. Nevertheless, NFCU wrongfully refused to return the funds.

### CLASS ACTION ALLEGATIONS

26.     Plaintiff incorporates by reference the preceding allegations of this Complaint.

27.     Plaintiff files the present action on behalf of itself and all others similarly situated, for (1) breach of UCC warranties, (2) money had and received, (3) unjust enrichment, (4) aiding and abetting by assisting and participating, negligence and other tort claims, (5) breach of contract, and (6) breach of Reg CC warranties and the return of Plaintiff's money under UCC § 3-418(a) and the Law of Mistake and Restitution, stemming from NFCU's actions as described further below. In addition to damages for the Class, this action seeks attorneys' fees, costs, interest, and any and all other relief to which Plaintiff shows itself and the Class to be justly entitled.

28.     Plaintiff proposes the following Class definition:

All banks and bank customers (1) within the United States and its territories (2) who have suffered financial loss as a result of check fraud facilitated by NFCU, (3) from January 10, 2022 to the present.

29.     Plaintiff proposes the following Texas Subclass definition:

All banks and bank customers (1) within the State of Texas, (2) who have suffered financial loss as a result of check fraud facilitated by NFCU, (3) from January 10, 2022 to the present.

30.     Excluded from the Class are Defendant as well as its agents and employees, Plaintiff's attorneys and their employees, the Judge whom the action is assigned as well as any member of the Judge's staff and immediate family.

31.     Numerosity: the Class is so numerous that joinder of all members of the Class is impractical. The precise size of the Class is unknown to Plaintiff at this time, but is believed to be more than 100. The precise Class number and their identities may be ascertained from NFCU's records.

32.     Commonality: there is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law and fact

exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common factual and legal questions include without limitation:

a. Whether NFCU has sufficient policies, practices and procedures for opening new accounts to prevent the opening of fraudulent accounts.

b. Whether NFCU's policy, practice and procedure of warranting through negotiation and/ or by allowing the deposit of stolen checks into fraudulently opened NFCU customer's accounts that all endorsements on checks are authentic and authorized and NFCU customers are entitled to enforce the checks constitutes a breach of UCC warranties.

c. Whether NFCU's policy, practice and procedure of crediting money to the wrong person or account based on mistaken or fraudulent checks establishes a claim for money had and received.

d. Whether NFCU's policy, practice and procedure of wrongly benefiting from mistaken or fraudulent checks constitutes unjust enrichment.

e. Whether NFCU's policy, practice and procedure of opening accounts that are used to conduct money laundering and/or bank fraud establishes that NFCU assisted and/or participated in the negotiation of checks and in the disbursement of funds to unauthorized parties which caused substantial damages to Class Members.

f. Whether NFCU's policy, practice and procedure of accepting checks that, under established banking procedures and norms, should not have been accepted establishes that NFCU aided and abetted in causing substantial harm to Class members.

8

g.  Whether NFCU's intentional disregard or negligent disregard for compliance with applicable Know Your Customer and AMC rules and regulations caused charges to maker's banks and/or their customers.

h.  Whether NFCU's policy, practice and procedure or allowing its customers to disburse stolen proceeds under suspicious circumstances establishes that NFCU violated UCC § 3-406 resulting in substantial harm to Class Members.

i.  Whether NFCU's policy, practice and procedure of allowing its customers to conduct bank fraud through failing to create and/or enforce proper safeguards violated UCC § 3-406 resulting in substantial harm to Class Members.

j.  Whether NFCU's policy, practice and procedure or allowing its customers to disburse stolen proceeds under suspicious circumstances establishes that NFCU aided and abetted bank fraud resulting in substantial harm to Class members.

k.  Whether NFCU's policy, practice and procedure of allowing its customers to conduct bank fraud through failing to create and/or enforce proper safeguards constitutes a breach of NFCU's duties under established banking procedures and norms, including those outlined by the Federal Financial Institutions Examination Council.

l.  Whether NFUC's policy, practice and procedure of not paying funds to the true intended payee constitutes breach of the contract created by the negotiation of the Check.

m.  Whether NFUC's policy, practice and procedure of accepting fraudulent checks violates its duty to exercise ordinary care and follow the rules and guidelines

for check acceptance, constituting a breach of warranty under the UCC and/or Regulation CC.

n.  Whether NFCU could have provided additional safeguards to reduce or stop its customer's bank fraud.

o.  Whether NFCU policies, practices and procedures result unlawfully declining valid claims for reimbursement from drawee banks, businesses, and individuals.

33.  Typicality: Plaintiff's claims are typical of the proposed Class because all members have been subjected to NFCU's policies, practices and procedures related to the opening of fraudulent accounts at NFCU and acceptance of checks that should not have been accepted, allowance of NFCU customers to conduct bank fraud, and/or failure to return monies improperly obtained.

34.  Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in complex litigation of this type.

35.  Common questions of law and fact with respect to liability issues, relief issues, and anticipated affirmative defenses predominate over any questions affecting only the individual members of the Class. NFCU subjected Plaintiff and the members of the proposed Class to the same NFCU policies, practices and procedures related to opening accounts and accepting checks under circumstances that directly contradict established banking requirements, in violation of Plaintiff's and Class members' rights.

36.  A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate

claims against Defendants is small. In addition, Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Individualized litigation increases the expense and delay to all parties and the court system. By contrast, class adjudication presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

JURISDICTION AND VENUE

37.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiffs and Class Members are citizens of states different from Defendant.

38.    The Court has personal jurisdiction over NFCU because, through its business of banking in this District, NFCU has established sufficient contacts in this District such that personal jurisdiction is appropriate.

39.    Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Specifically, money was improperly withdrawn from a Buckholts customer's account as a result of fraud, Buckholts attempted to recover the funds through banking claims procedures, and Buckholts has suffered the loss of the funds as a result of NFCU rejecting Buckholts's claim.

BUCKHOLTS' DIRECT CAUSES OF ACTION

I.    BREACH OF UCC WARRANTIES

40.    With regard to the UCC warranty issues, as more specifically described below, in accordance with UCC §4.207, NFCU, as an endorser and/or transferor of the Check, warranted to

11

Buckholts, that its customer was authorized to enforce the item, and that the proper endorsements had been obtained on the Check.

41.    The Check was paid over to Defendant even though Defendant was not authorized to enforce the Check. Section 4.207 of the UCC provides in part that:

> (a)    A customer or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and any subsequent collecting bank that:
>
> (1)    the warrantor is a person entitled to enforce the item;
>
> (2)    all signatures on the item are authentic and authorized;
>
> (3)    the item has not been altered;
>
> * * * *
>
> (c)    A person to whom the warranties under Subsection (a) are made and who took the instrument in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach . .
>
> (d)    The warranties stated in Subsection (a) cannot be disclaimed with respect to checks.

*See also*, UCC §§ 3.416, 3.417 and 4.208. In other words, by virtue of Defendant's transfer and/or presentment of the Check to Buckholts, NFCU warranted that it was entitled to enforce the item and all signatures were authentic and authorized, that the Check was properly negotiated with proper signatures and warranties, and that the Check was not altered. Therefore, if a fact finder determines that the Check was improperly negotiated because the Check was altered, the

endorsements were forged or unauthorized, and/or that the proper endorsements were missing (or NFCU was not entitled to enforce the items), Defendant will be held liable to Buckholts for all damages sustained by Buckholts as a result of the breach of warranty up to the face amount of the Check, plus any lost interest and all consequential damages, including attorneys' fees and expenses, incurred by Buckholts in connection with prosecution and/or defense of the claims associated with NFCU's transfer and presentment of the Check.

42.    NFCU warrantied to Buckholts that all endorsements on the Check were authentic and authorized, and the depositor was entitled to enforce the items. The account at NFCU and the Check were fraudulent, so Defendant NFCU violated the warranty that all signatures on the item were authentic and authorized. NFCU's customer was not authorized to enforce the item. Thus, the NFCU is obligated to pay the amount equal to the loss suffered as a result of the breach of warranty plus expenses and loss of interest incurred as a result of the breach as set forth in the UCC. *See e.g., C&N Contractors, Inc. v. Community Bancshares, Inc*., 646 So.2d 1357, 1360 (Ala. 1994).

43.    More specifically, as discussed herein, NFCU allowed the opening of a fraudulent account, accepted for deposit and then negotiated and presented the Check in dispute. NFCU transferred and/or presented the Check for payment to Buckholts, thereby making the presentment and/or transfer warranties set forth in the UCC and causing Buckholts to suffer damages. NFCU then wrongfully denied a valid claim for reimbursement from Buckholts.

**II.    MONEY HAD AND RECEIVED**

44.    Defendant is liable to Buckholts for money had and received. The only thing that needs to be proved in a claim for money had and received "is that defendant holds money which in equity and good conscience belongs to [the plaintiff]." *London v. London*, 192 S.W.3d 6, 13

(Tex. App.—Houston [14th Dist.] 2005, pet. denied) (quoting *Staats v. Miller*, 243 S.W.2d 686, 687–88 (1951)). Money had and received "is an equitable doctrine that courts apply to prevent unjust enrichment." *Id.* (*citing Miller-Rogaska, Inc. v. Bank One*, 931 S.W.2d 655, 662 (Tex. App.—Dallas 1996, no writ). "The cause of action is not premised on wrongdoing but looks to the justice of the case and inquires whether the party has received money that rightfully belongs to another." *Id.* (citing *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ). The question in an action for money had and received is to which party the money, in equity and law, belongs. *Id.* (citing *Staats*, 243 S.W.2d at 687). Here, Defendants hold money or held money, which in equity and good conscience belongs to Buckholts and/or its customer.

45.    Several courts have held that claims for money had and received were recoverable where payment was made based on mistake, fraud, or in other similar circumstances. Indeed, courts have allowed restitution for these types of claims in a variety of cases:

> [B]y a defrauded party against the party who committed the fraud, *see Staats*, 243 S.W.2d at 686–88; *Wiseman v. Baylor*, 6 S.W. 743, 743–44 (Tex. 1887); by a party that made an overpayment, *Benson v. Travelers Ins. Co.*, 464 S.W.2d 709, 710–13 (Tex. Civ. App.—Dallas 1971, no writ); and by a party that paid or credited money to the wrong person or account, *see Amoco Prod. Co.*, 946 S.W.2d at 163–65 (payment to wrong person); *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 710–11 (Tex. App.—Corpus Christi 2006, pet. denied) (payment applied to wrong account); *Lyman D. Robinson Family Ltd. P'ship v. McWilliams & Thompson, P.L.L.C.*, 143 S.W.3d 518, 520 (Tex. App.—Dallas 2004, pet. denied) (earnest money released to wrong client).

*Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837–38 (Tex. App.—Dallas 2008, pet. denied).

46.    In *Benson* for example, the court explained, "[i]t has been stated as a rule of law that if payments were made because of a serious mistake of fact by the insurer, it is entitled to restitution unless it has agreed to assume the risk of mistake or there is some reason which makes it inequitable or inexpedient for restitution to be granted." *Benson v. Travelers Ins. Co.*, 464

14

S.W.2d 709, 712–13 (Tex. Civ. App.—Dallas 1971, no writ) ("numerous cases throughout the United States are cited in support of this general principle of law."). Accordingly, the court held that the plaintiff was entitled to recover on its claim for overpayment by mistake, even though the mistake was unilateral and not induced by fraud, imposition, undue influence, or betrayal of confidence. *Id.* at 710–13.

47.    Defendant NFCU allowed bank fraud and it should not have received the funds from Buckholts and should not have released funds to its customer. An action for money had and received arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff. *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied); *Staats v. Miller*, 243 S.W.2d 686, 687 (1951). This action is not premised on wrongdoing; it looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another. *Greer v. White Oak State Bank,* 673 S.W.2d 326, 329 (Tex. App.—Texarkana 1984, no writ). Defendant received the funds in the form of the Check, and those funds belong to Buckholts in equity and good conscience. Simply put, NFCU received funds it should never have received.

### III.    UNJUST ENRICHMENT

48.    Likewise, Defendant was unjustly enriched from money that rightfully belongs to Buckholts by refusing to return funds obtained from the Check. The doctrine of unjust enrichment applies to address such a situation. A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *See Pope v. Garrett,* 211 S.W.2d 559, 560 (Tex. 1948); *Austin v. Duval,* 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied).

49.     Unjust enrichment is a cause of action based upon the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *Friberg-Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 (Tex. App.—Fort Worth 2006, pet. filed) (quoting *Walker v. Cotter Props., Inc.,* 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)), *rev'd on other grounds,* 240 S.W.3d 869 (Tex. 2007); *Mowbray v. Avery,* 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied); *see Best Buy Co. v. Barrera,* 214 S.W.3d 66, 73 (Tex. App.—Corpus Christi 2006, pet. filed), *rev'd on other grounds,* 248 S.W.3d 160 (Tex. 2007). Unjust enrichment occurs when a person wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied).

50.     A claim for unjust enrichment requires proof of the following elements: (1) Defendants obtained a benefit from Plaintiff by fraud, duress, or taking undue advantage; or (2) when a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *Burlington N. R.R. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), aff'd, 966 S.W.2d 467 (Tex.1998); *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992); *Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 319 (Tex. App.—Tyler 1996, no writ).

51.     "Unjust enrichment" is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348 (Tex. App.—Dallas 2009, pet. denied). Here, Defendant NFCU was unjustly enriched when it received

funds it should never have received, and it wrongfully obtained the benefit of the Check from Buckholts, which gives rise to Defendant's obligation to make restitution payments to Buckholts in the amount of the Check.

## IV.   AIDING AND ABETTING BY ASSISTING AND PARTICIPATING, NEGLIGENCE AND OTHER TORT CLAIMS

52.     A court should also grant a judgment in favor of Plaintiff based on the doctrine of aiding and abetting by assisting and participating.  *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969).  Assisting and participating has long been recognized as a theory for imposing joint liability in Texas.  *See Id.*  When a defendant assists and participates in causing a particular result with another actor, the defendant is responsible for the result of the united effort if the act, by itself, was a breach of duty and was a substantial factor in causing the result.  *See* RESTATEMENT (SECOND) OF TORTS § 876(c) cmt.  It is not necessary for the defendant to know that the act of the other actor was tortious; an unintended tort will suffice.  *See Id.*

53.     NFCU assisted and/or participated first in allowing the fraudulent account to be opened, then in the negotiation of the Check, and further in allowing the suspicious or unusual disbursements of the funds to an unauthorized party which caused Plaintiff to suffer substantial damages.  NFCU is responsible for the result of this united effort because its breach of duty was a substantial factor in causing the losses Plaintiff suffered.

54.     NFCU opened accounts that were used to conduct money laundering and/or bank fraud.  NFCU accepted a check it never should have accepted.  NFCU violated Know Your Customer and AMC rules and regulations in failing to monitor the account and stop suspicious and unusual transactions. NFCU's actions in allowing its customer to open a Business Account and disburse the stolen proceeds under suspicious circumstances aided and abetted the Check fraud.

NFCU also made fraudulent statements to Plaintiff and such statements caused damages.  By virtue of the acts and conduct of NFCU, Plaintiff has suffered damages.

55.    The losses sustained by Plaintiff were made possible because of NFCU's disregard of its own internal documentation and existing federal law including applicable AML/BSA[2] regulations.

56.    It is a fundamental tenet of banking that banks are required to know their customers and understand their customers' banking behavior. See 31 C.F.R. §§ 1020.220(a)(1) and (2). This provision is commonly referred to as the "Know Your Customer" Rule. As a result of the Know Your Customer Rule applicable to federally chartered financial institutions, NFCU is required to collect information about the holder of each account. As part of that process, when an account is opened with NFCU its employees are required to obtain information concerning the individuals who control the account along with such other information as may be required to confirm that the signatories to the account are, in fact, authorized to act in the manner proposed through the account.

57.    NFCU maintains that it and each of its employees must comply with applicable rules, regulations, and NFCU policies.  NFCU is also required to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws.  See, e.g., 12 C.F.R. § 21.21. The program is to be approved by the financial institution's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the financial institution's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel. NFCU

---

[2]    AML/BSA laws refer to the collective federal anti-money laundering laws and regulations including but not limited to 12 C.F.R. § 21.11, 12 C.F.R. § 21.21, 31 C.F.R. § 1010, 31 C.F.R. § 1020.

has represented that NFCU has procedures in place that comply in all respects with AML laws, and NFCU complies with all applicable laws. NFCU also continues to represent in its public filings with the Securities and Exchange Commission that compliance with "all applicable laws, regulations, and Company policies" is the obligation of each and every employee of NFCU.

58.    NFCU maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the credit union with a means of identifying unusual or suspicious transactions for each customer. On information and belief, the programs utilized by NFCU include DIPR, EWS, Client Relationship Manager, Hogan, TellerVision, Actimize, StoreVision, and Universal Workstation.

59.    On information and belief, the customer due diligence programs allow NFCU to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. Specifically, Actimize is an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions. Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance Red Flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

60.    NFCU designates a senior credit union official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the financial

institution's day-to-day compliance, including the likely branches used by NFCU's customers where the Check was deposited.

61.    The federal government established the Federal Financial Institutions Examination Council ("**FFIEC**") in 1979. NFCU receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry. There are many other badges of fraud, and examples of these suspicious indicia relevant to the banking activities at NFCU include:

a.    Funds transfer activity is unexplained, suspicious, or shows unusual patterns.

b.    A large volume of ... funds transfers are deposited into ... an account when the nature of the accountholder's business would not appear to justify such activity.

c.    Money is deposited into an account and quickly moved or transferred elsewhere.

d.    A large amount of money is deposited into a new account.

e.    Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.

f.    Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank.

g.    A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations.

h.  Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose.

i.  Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the purported true customer's operations.

j.  Funds are sent or received via international transfers from or to higher-risk locations.

62.    Here, a new Business Account was opened and used to commit bank fraud. On information and belief, NFCU allowed many other newly opened accounts to be used for bank fraud. Consistent with FFIEC guidance, NFCU represents that it maintains a system of controls sufficient to identify patterns of account activity, particularly activity between NFCU accounts. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, can be examined through this system. NFCU represents that it has procedures in place to analyze suspicious activity against the backdrop of industry norms and each member's background. Pursuant to the FFIEC guidelines, NFCU is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to determine the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

63.    According to established banking norms and requirements, NFCU should collect and maintain information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational injury.  NFCU should also maintain procedures to know the identity of each customer (as required by 31 C.F.R. § 1020.220(a)(1)), and to collect information about the holder of each account (as required by 31 C.F.R. § 1020.220(a)(2)). When an entity rather than an individual opens an account, NFCU should obtain information about the individual who will

control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that NFCU should collect about new business account customers includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer. In the case of business accounts, NFCU should ascertain the actual authority of the person to act. Again, in this case, NFCU customers are opening fraudulent NFCU accounts and using those accounts to conduct check fraud to take money from innocent downstream banks like Buckholts and other members of the proposed class.

64. Under established banking procedures, NFCU is expected to create an initial client profile using the information collected, along with the other resources available to it like internet search engines and public and commercial record databases and assign a compliance-related risk rating. Neither the profile nor the risk rating are fixed; these remain subject to change based upon the actual activity in the account and updates or changes in the member profile. When NFCU becomes aware that member information has materially changed, its internal controls should require updating that information and, where appropriate, reassessing the member's risk profile or rating. One of the ways in which the credit union should become aware of such changes is when the member's transactions appear inconsistent with the credit union's understanding of the nature and purpose of the account, for instance, when there are significant, unexplained changes in account activity. The credit union may also become aware through direct notification events from governmental authorities.

65. Under applicable federal regulations, NFCU is also required to maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the credit union's compliance, regular monitoring of compliance, and training of personnel.

These controls also include customer due diligence programs to prevent and detect money laundering. Through these programs, NFCU obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, NFCU can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

66.     Before NFCU credits a large check, multiple credit union personnel should review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payer, the payee (i.e., the customer), and the depositor. When these efforts detect unusual activity, employees are supposed to examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or who have worked on the account. Various branch-level personnel should also regularly review Balance Fluctuation Reports. These reports should highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

67.     As a direct and proximate cause of the breach by NFCU of the duties as described throughout, Plaintiff has sustained damages in an amount to be determined at trial.

## V.    BREACH OF CONTRACT

68.     The Check is a contract. *See 1/2 Price Checks Cashed v. United Automobile Insurance Co.*, 344 S.W.3d 378, 387 (Tex. 2011) (treating holder's suit to recover for the amount of a check as sounding in contract). When Defendant NFCU accepted for deposit and/or negotiated and paid the Check, it contracted with the maker by acknowledging, even embracing, its status as a holder of the Check. *See, e.g., Howard Indus., Inc. v. Crown Cork & Seal Co., LLC*, 403 S.W.3d 347, 350–

51 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also 1/2 Price Checks, supra; Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008) (discussing article 2 express warranty).

69.    Here, NFCU violated the contract by receiving funds from Buckholts that were not supposed to go to NFCU. Consequently, under *1/2 Price Checks Cashed v. United Automobile Insurance Co.*, 344 S.W.3d 378, 387 (Tex. 2011), the Check is considered to be a contract, and NFCU has breached the contract.

70.    The Check is considered to be a contract under Texas law, therefore NFCU needs to be held to the terms of that contract in that NFCU needed to pay the money to the maker or to the true payee who was entitled to the money.  NFCU also needs to be held to the terms of the contract that the Check was allegedly properly payable.

71.    A party may succeed on its breach of contract claim, when they plead and prove the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.).  "When the evidence is undisputed regarding a person's conduct under a contract, the court as a matter of law determines whether the conduct shows performance or breach of a contract obligation." *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *see also MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999) (holding that construction of unambiguous contract is a question of law for the court).

72.    "The first element in a breach of contract case is that plaintiff must prove the existence of a valid contract wherein the defendant promised to perform in the manner the plaintiff

alleges he failed to perform." *Villarreal v. Art Inst. of Hous., Inc.*, 20 S.W.3d 792, 798 (Tex. App.—Corpus Christi 2000, no pet.) (emphasis added). "A breach of contract occurs when a party fails or refuses to do something he has promised to do." *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (emphasis added). Here, each check is considered to be a valid contract between Plaintiff and Defendants. Defendants breached the contract by allowing the improper negotiation of the Check.

73.    The second element to breach of contract is performance. Performance by Plaintiff was giving credit to Defendants for the amount of the Check.[3]

74.    In order for Plaintiff to succeed on a claim for breach of contract, Plaintiff must also plead and prove that the damages it claims to have suffered were the "result of" the alleged breach. *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.); *Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 898 (Tex. App.—San Antonio 2002, no pet.). Specifically, the evidence must show that the damages are the "natural, probable, and foreseeable consequence" of the defendant's conduct. *Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 396–97 (Tex. App.—El Paso 1998, pet. denied) (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981); *Winograd v. Clear Lake City Water Authority,* 811 S.W.2d 147, 156 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). Here, Plaintiff has suffered damages in the amount of the Check.

---

[3]    See also *½ Price Checks Cashed v. United Automobile Insurance Co.*, 344 SW 3d 378 (Tex. 2011).

## VI.  PLAINTIFF'S ALTERNATIVE CLAIMS UNDER REG CC WARRANTIES AND UCC §3-418(A)

75.    Regulation CC outlines specific requirements and obligations related to check collection and warranties.  Specifically, Section 229.34 governs the warranties made by financial institutions when they accept checks.  It stipulates that financial institutions are required to exercise ordinary care and follow the rules and guidelines for check acceptance.  NFCU's acceptance of the Check constituted a breach of warranty under Regulation CC.

76.    NFCU may try to claim that its customer properly endorsed the Check and that it properly transferred and presented the check to Buckholts, but the maker determines the proper payee. Plus, if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that "the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance."[4]   Comment 2 to UCC Section 3-418(a) makes this explicit: "If a check has been paid by mistake and the payee receiving payment did not give value for the check or did not change position in reliance on the payment, the drawee bank is entitled to recover the amount of the check under subsection (a) regardless of how the check was paid.[5]

77.    Even if it is determined that Plaintiff "mistakenly" paid NFCU, then NFCU still holds Plaintiff's "mistaken" payment, and Plaintiff is entitled to recover from NFCU.  Under those pleaded facts, and if some payment was recovered in certain cases, the UCC can deem NFCU not

---

[4]   U.C.C. § 3-418(a).
[5]   U.C.C. § 3-418, cmt. 2.

to have paid the instrument at all.[6]  As NFCU has not paid it and does not intend to, NFCU cannot

retain Plaintiff's payment, would not be a holder in due course,[7] and must return the money

withdrawn from Buckholts.

78.    The UCC's presentment and transfer warranties under §§ 3-416 and 3-417 and its

recovery limitations in § 3-418 all represent a loss-allocation scheme.[8]    In the case of money

recovered by NFCU from Plaintiff, NFCU has suffered no loss and taken nothing "for value."

Rather, it holds Plaintiff's recovered money to Defendant's benefit and Plaintiff's detriment.  With

respect to the recovered portion of the fraudulent check amounts, Defendant must return Plaintiff's

payments. If Defendants do not return the money at Plaintiff's request, they will have benefitted

from the fraud, converted[9] the money in violation of the recoveries permitted by UCC Section 3-

418 and will thus be liable for that amount to Plaintiff.

**VII.    PLAINTIFF IS ENTITLED TO RECEIVE ITS ATTORNEYS' FEES, COSTS, AND EXPENSES.**

79.    Plaintiff should be awarded its attorneys' fees, costs, and expenses it incurred in

having to bring this lawsuit.  Defendant breached warranties and breached the contract. Plaintiff

---

[6]    By analogy to U.C.C. § 3-418(d):  "[When] acceptor recovers payment or revokes acceptance
. . . the instrument is deemed not to have been paid or accepted." Just as, under 3-418(d), a drawee
bank may not claim it has paid an instrument after recovering money it has paid by mistake, neither
should a depositary bank be permitted to claim it has paid an instrument after recovering the money
it paid.
[7]    U.C.C. § 3-302(a)(2). A holder in due course "took the instrument (i) for value, (ii) in good
faith . . . ."
[8]    *Perini Corp. v. First Nat'l Bank*, 553 F.2d 398, 403 (5th Cir. 1977); *Sw. Bank v. Info. Support
Concepts, Inc*., 149 S.W.3d 104, 111 (Tex. 2004).
[9]    *See Quilling v. Compass Bank*, No. 3:03-CV-2180-R, 2004 U.S. Dist. LEXIS 18811, at *22
(N.D. Tex. 2004) (holding that the final payment rule as amended in 1995 does not bar a claim for
conversion).  Elements of conversion: "unauthorized and wrongful assumption and exercise of
dominion and control over the personal property of another to the exclusion of, or inconsistent
with, the owner's rights."  *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts*, 300
S.W.3d 348, 365 (Tex. App.—Dallas 2009, pet. denied).

therefore seeks such amounts as reasonable and necessary attorneys' fees incurred in this matter, plus additional fees and costs, including appellate fees and costs.

80.    Various cases allow attorneys' fees under transfer and/or presentment warranties. *See, e.g., First Virginia Bank-Colonial v. Provident State Bank*, 38 UCC Rep. Serv. 561, 582 F. Supp. 850 (D. Md. 1984); *First Nat'l Bank of Neenah v. Security Nat'l Bank of Springfield,* 32 UCC Rep. Serv. 926 (D. Mass. 1981); *Southern Provisions, Inc. v. Harris Trust & Savings Bank*, 31 UCC Rep. Serv. 640, 96 Ill. App. 3d 745, 422 N.E.2d 33 (1981). Thus, Plaintiff seeks to recover its attorneys' fees, costs, and expenses on this ground as well.

81.    The Fifth Circuit Court of Appeals has held that UCC Section 4-207 includes attorneys' fees in the amount recoverable by a bank to whom the transfer warranty runs. *See Perkins State Bank v. Connolly*, 632 F.2d 1306, 1315 (5th Cir. 1980). In *Perkins State Bank*, Hanover Bank brought a breach of transfer warranty counterclaim and was entitled to receive the attorneys' fees spent in defense of the claim as an element of damages. *Id*. at 1316. Hanover Bank had issued a cashier's check that was fraudulently endorsed and deposited into a trust account at Perkins State Bank. *Id*. at 1308. Perkins State Bank was found to be liable to Hanover for a breach of Florida's UCC Section 4-207 transfer of warranty. The court read § 4-207 to establish a right of indemnity under state law. *Id*. at 1315. The court based its reasoning on an 8th Circuit Court of Appeals decision which found that attorneys' fees incurred in defense of the claim are a part of the damages sought in an indemnity action under state law and therefore allowed under § 4-207. *Id*. (citing *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 491 F.2d 192 (8th Cir. 1974).

82.    Other courts have held that attorneys' fees can be awarded in a suit for breach of transfer warranty in regards to a negotiable instrument under § 4-207 of the UCC, which provides that attorneys' fees be awarded as expenses in appropriate cases. *Guaranty Bank & Trust Co. v.*

*Federal Reserve Bank of Kansas City*, 454 F. Supp. 488, 492 (W.D. Okla. 1977) (*citing* U.C.C. § 4-207 cmt. 5 (amended 2002)).  The court in *Guaranty Bank & Trust Co. v. Federal Reserve Bank of Kansas City* found that it was appropriate to award attorneys' fees as expenses to the payor bank where a collecting bank breached a transfer of warranty when it presented a fraudulent cashier's check to the payor bank. *Id.  See also*, *First Virginia Bank-Colonial v. Provident State Bank*, 582 F. Supp. 850, 852 (D. Md. 1984).  The court analyzed that Comment 5 to UCC Section 4–207 transfer of warranty requires the court to decide whether a particular case is an "appropriate" one for the inclusion of attorneys' fees in the expenses recoverable under UCC Section 4–207(3).  *Id.* at 852.  The court held that when a payor bank must enforce the clear warranty liability of the depositary bank through litigation, the payor bank is entitled to attorneys' fees.  *Id.*

**CONDITIONS PRECEDENT**

83.    Any and all conditions precedent to Plaintiff's right to bring this lawsuit and recover from the Defendants have been fully performed by Plaintiff or have occurred.

**PRAYER**

84.    Plaintiff prays that Defendant be cited to appear and answer by written denial and that the Court grant Plaintiff Judgment against Defendant as follows:

(a)    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class and Subclass Representative and appointing the undersigned counsel as Class Counsel;

(b)    For all recoverable actual, special, and/or equitable damages or remedies as are set forth herein and at the time of trial;

(c)    A declaration that defendant holds the described property and profits as constructive trustees for the benefit of the plaintiff;

29

(d)     A declaration that defendant does not possess or own any interest in the described

property;

(e)     Ordering the conveyance of the described property from defendant to plaintiff, free

and clear of any and all interests, liens, and claims;

(f)     For pre-judgment and post-judgment interest as provided by law;

(g)     For punitive and exemplary damages;

(h)     For reasonable and necessary attorneys' fees at all stages of trial and appeals; and

(i)     For all such other and further relief, at law or in equity, to which Plaintiff may be

justly entitled.

Dated: January 10, 2025                          Respectfully submitted,

By: _/s/John R. Fabry_____
            John R. Fabry, Texas Bar No. 06768480
            Morgan R. Ferrell, Texas Bar No.
            24132044
            **THE CARLSON LAW FIRM, P.C.**
            559 S. Interstate Hwy 35
            Suite 250
            Round Rock, TX 78664
            Telephone: (512) 671-7277
            jfabry@carlsonattorneys.com
            mferrell@carlsonattorneys.com

            Amos L. Barton
            Texas Bar No. 24031847
            **THE CARLSON LAW FIRM, P.C.**
            301 Junction Highway, Suite 100
            Kerrville, Texas 78028
            Phone: (830) 257-7575
            Fax: (830) 257-7580
            Abarton@carlsonattorneys.com

            William P. Huttenbach
            Texas Bar No. 24002330
            **CRAIN CATON & JAMES**
            1401 McKinney, Suite 1700
            Houston, Texas 77010

30

(713) 658-2323 Main
(713) 658-1921 Fax
whuttenbach@craincaton.com

***Attorneys for Plaintiff and the
Proposed Class***