## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

| | | |
|---|---|---|
| BUCKHOLTS STATE BANK, SUSSER BANK, AND CIERA BANK, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| V. | § | Case No. 1-25-cv-00052 |
| | § | |
| NAVY FEDERAL CREDIT UNION | § | |
| | § | |
| *Defendant.* | § | |

### PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Buckholts State Bank ("Buckholts"), Susser Bank ("Susser"), and Ciera Bank ("Ciera") (collectively "Plaintiffs"), file this Class Action Complaint against Defendant, Navy Federal Credit Union ("NFCU"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and counsel's investigations, and upon information and belief as to all other matters, as follows:

### NATURE OF THE CASE

1.      Buckholts initiated this case individually and on behalf of all others similarly situated ("Class Members" or "the Class") who have suffered losses arising out of check fraud facilitated through Defendant, NFCU. Buckholts became a victim of NFCU and its inadequate policies, practices and procedures after a customer wrote a check that was then stolen in the U.S. Mail. NFCU then allowed the check thieves to open a Business Account at NFCU in the name of the payee on the stolen check. NFCU facilitated the creation of the fraudulent account, then immediately cleared the stolen check via deposit into the fraudulent account on January 10, 2023. NFCU allowed the fraudulent account holder immediate access to the funds for transfer and

withdrawal.  Neither NFCU nor its customer were entitled to enforce the check because the endorsement on the check was not authorized.  Buckholts timely notified NFCU of its error and requested that a credit be issued by NFCU to Buckholts. NFCU responded on May 15, 2023 that it had completed its research and was denying the claim.

2.      Buckholts, in order to properly investigate whether it could make any claims against NFCU to recover the funds and to determine the veracity of NFCU's representations to Buckholts in denying the claim, filed a petition under Texas Rule of Civil Procedure 202 to depose NFCU. NFCU fought, obstructed, and delayed the deposition as well as production of documents. In fact, as of the date of this filing, NFCU still has not produced all of the documents it was ordered to produce by the Texas State District Court Judge. Nevertheless, Buckholts was able to learn enough about the significant amount of check fraud occurring through NFCU, and how NFCU deflects the losses to others, to bring this lawsuit. One fact learned from the Rule 202 deposition of NFCU's designated corporate representative is that at the time NFCU declined to return the fraudulently obtained funds to Buckholts, NFCU had already determined through its own internal investigation that the NFCU account into which the stolen check proceeds were deposited was fraudulent and had closed it.  Buckholts also learned that, during the relevant period, hundreds of millions of dollars in fraud were occurring through NFCU via hundreds of fraudulent accounts.  Notably, NFCU has been able to limit its own losses to approximately 1% of the total fraud exposure stemming from fraudulent NFCU accounts.

3.      Since this lawsuit was filed, other banks have contacted Plaintiffs' counsel about check fraud issues and losses they have suffered with NFCU. Plaintiff Susser's customer, Pronto Delivery, issued check number 42715 in the amount of $26,407.44, dated June 17, 2022, payable to Roundstone Management, Ltd. The check was intercepted in the mail, altered, and check number

42715 in the amount of $26,407.44 was presented to NFCU with a different payee, Lawanda Staton. The maker of the check never intended the funds to go to NFCU's customer. Instead, a NFCU customer, possibly using the name Lawanda Staton, altered the check, deposited the check at NFCU, and NFCU received but has not returned the funds. Like Buckholts, Susser submitted a written claim request to NFCU for return of the stolen funds, which NFCU denied on February 8, 2023.

4.      Plaintiff Ciera's customer, Susan Barry, also asserts that a fraudulent check was paid out of her account. The check is identified as number 1118 in the amount of $464.00, dated July 12, 2024, payable to Deercreek HPR, Inc. The check was intercepted in the mail, altered, and check number 1118 in the new amount of $9,661.52 was presented to NFCU with a different payee, Quinlan Abney. The maker of the check never intended the funds to go to NFCU's customer. Instead, a NFCU customer, possibly using the name Quinlan Abney, altered the check, deposited the check at NFCU, and NFCU received but has not returned the funds. Like Buckholts and Susser, Ciera submitted a written claim request to NFCU for return of the stolen funds, which NFCU denied on or around August 15, 2024.

### PARTIES

5.      Plaintiff Buckholts is a financial institution organized and authorized to do business under the laws of the State of Texas, and located at 100 N. 4th Street, Buckholts, Texas.

6.      Plaintiff Susser is a financial institution organized and authorized to do business under the laws of the State of Texas, and located at 1990 Post Oak Blvd, Suite 110, Houston, Texas 77056.

7.      Plaintiff Ciera is a financial institution organized and authorized to do business under the laws of the State of Texas, and located at 623 Elm Street, Graham, Texas 76450.

8.      Defendant, NFCU, is a global banking institution headquartered in Virginia, with more than 24,500 employees worldwide, $177 billion in assets, 13.8 million customers, and numerous locations in Texas, including within the Western District of Texas. Upon information, belief, and investigation, NFCU's policies, practices and procedures regarding liability determining actions and non-actions described in this Complaint, such as standards for opening Business Accounts, check fraud review, and denial of claims from innocent downstream banks, were set by, approved or ratified at NFCU's headquarters in Virginia, and applied uniformly across NFCU's nationwide operations.

## FACTUAL ALLEGATIONS

### I.    NFCU'S INSUFFICIENT "KNOW YOUR CUSTOMER" REQUIREMENTS

9.      Fraud is rampant in the banking industry. Know Your Customer ("KYC") rules are a mandatory, a key component of Anti-Money Laundering ("AML") laws and the fight against financial crime, fraud, money laundering, and terrorist financing.

10.     NFCU provides both personal and business customer accounts ("Business Accounts").

11.     Although NFCU purports to limit eligibility for personal customer accounts to "current and retired members of the armed forces, immediate military family members, Department of Defense civilians, and more," personal account applicants are not required to provide documentation demonstrating eligibility for membership. Instead, NFCU accepts the attestation of the applicant. The personal customer accounts are referred to internally as "memberships."

12.     Business Accounts may be opened by NFCU members who also have a personal customer account. Business Accounts are opened only through an online portal using the member's personal NFCU credentials. NFCU does not require customers to have a personal account with

3

NFCU for any established length of time. Rather, Business Accounts can be opened at the same time as personal accounts.

13.     Individuals who conduct check fraud through NFCU often open fraudulent Business Accounts shortly after stealing a check, then deposit the stolen check with NFCU and quickly withdraw the funds.

14.     The only requirements for a Business Account are proof of existence documents and a completed NFCU application.

15.     Proof of existence documents include a Good Standing Certificate from the Secretary of State and a Notice from the Internal Revenue Service showing the assignment of an employer identification number.

16.     NFCU does not require that a business be in existence for any specified length of time before opening a NFCU Business Account, and often businesses register with a state's Secretary of State for the purpose of committing check fraud shortly before applying to NFCU for a Business Account.

17.     NFCU Business Account applications require certain information, such as the address of the business.

18.     NFCU does not verify the listed business address of a Business Account applicant, nor does it require proof of address. Often check thieves—for the purpose of committing check fraud—provide false addresses.

## II.    NFCU'S ACKNOWLEDGEMENTS

19.     NFCU acknowledges that it is a target for the types of check fraud described herein. NFCU acknowledges that its policies, practices, and procedures with respect to the creation of Business Accounts and check fraud are inadequate to stop the kind of fraud involved in this matter.

20.     NFCU acknowledges that the types of check fraud that are the subject of this matter are the same fraud trend seen each month by NFCU for years in NFCU's operation for "first-party fraud" and "business ID theft accounts."

21.     NFCU knows that criminals share information on the web about how to exploit NFCU, and specifically exploiting the lax policies, practices and procedures of NFCU.

22.     NFCU acknowledges that within a single department (First Party Fraud), the average single check fraud transaction amount is $10,000 and that approximately 19,200 fraudulent checks are negotiated annually through NFCU, affecting over 100 downstream banks. NFCU states that it is not "shocked by that number."

23.     Under NFCU's business risk policy, it does not review checks for fraud unless the check value meets or exceeds $25,000. Because of this threshold,  NFCU is unable to estimate the volume of fraud being facilitated through NFCU for checks with a value under $25,000.  NFCU justifies its $25,000 check review threshold because of the increased cost - there would be "thousands and thousands and thousands" more checks to review.  NFCU acknowledges that all it takes to bypass the review process for fraudulent checks is for the check value to be less than $25,000.  NFCU acknowledges that the threshold of $25,000 is set due to NFCU resource management and not risk management.

24.     NFCU, armed with this knowledge, has not made a single change in policy, practice, or procedure to prevent the types of check fraud that are the subject of this Complaint.

III.    **PLAINTIFFS SUFFERED FROM NFCU'S LAX POLICIES, PRACTICES AND PROCEDURES ALLOWING ITS CUSTOMERS TO COMMIT CHECK FRAUD**

25.     In this case, money was improperly withdrawn from Buckholts. Buckholts' customer, Intex Distributing Co, Inc. wrote check number 071628 dated January 6, 2023 in the amount of $16,575.90 payable to M&B Metal Products in Leeds, Alabama. The check was stolen

in the mail. On January 4, 2023, NFCU then allowed one of its customers to open a Business Account in the name of the payee on the check. NFCU then allowed its customer to deposit the check into the fraudulently opened Business Account on January 10, 2023. The funds were allowed to be transferred, debited, or withdrawn starting that same day.

26.    The check was accepted for deposit by NFCU. NFCU then made representations and warranties to Buckholts about the check. Buckholts paid the check based on NFCU's representations and warranties, and Buckholts reasonably expected that NFCU fully complied with KYC and AML rules and regulations. Buckholts made multiple requests to NFCU for return of the funds improperly withdrawn and transferred to NFCU by virtue of NFCU's customer depositing the check into the fraudulently opened NFCU account.  Neither NFCU nor NFCU's customer had any right to the proceeds from the check. NFCU's internal investigation determined that the account was fraudulent prior to Buckholts making its claim for reimbursement.

27.    Likewise, Susser, and Ciera have also been harmed because checks were presented against their respective customer's accounts that should not have been accepted for deposit and/or negotiated by NFCU. And NFCU should not have transferred and/or presented the checks to Plaintiffs Susser and Ciera.  NFCU wrongfully released the funds represented by the stolen and altered checks deposited into the fraudulent NFCU customer accounts. NFCU has directly caused damages by accepting altered checks and checks with improper, forged and/or missing endorsements and then transferring and presenting the checks to the makers' banks.  The makers' banks were unaware of the check fraud at the time of presentment.

### NFCU'S ACTIONS AND NON-ACTIONS REGARDING CHECK FRAUD AND FRADULENT BUSINESS ACCOUNTS TOOK PLACE IN VIRGINIA

28.                        Upon information, belief and  investigation, NFCU's *liability-determining* "actions and non-actions" with respect to the "presentment, payment, or

collection" of the fraudulent checks at issue—including NFCU's institutional decision to deny Plaintiffs' reimbursement claims—were made by NFCU through policies, practices and procedures that were set by, ratified or approved at its headquarters in Virginia. *See* UCC § 4-102(b), cmt. c ("The phrase 'action or non-action with respect to any item handled by it for purposes of presentment, payment, or collection' is intended to make the conflicts rule of subsection (b) apply from the inception of the collection process of an item through all phases of deposit, forwarding, presentment, payment and remittance or credit of proceeds.") (emphasis added); Va. Code § 8.4-102(b) (Virginia's codified version of UCC § 4-102(b)); TEX. BUS. & COMM. CODE § 4.102(b) (same).[1] On information, belief and investigation, even when NFCU employees in other states investigated suspected check fraud and reviewed specific checks and business accounts, including the opening of Business Accounts used to facilitate check fraud, those employees acted pursuant to NFCU's policies, practices and procedures established at NFCU's headquarters in Virginia.

29.    Accordingly, under UCC § 4-102(b), codified in Virginia as Va. Code § 8.4-102(b), Virginia law governs Plaintiffs' UCC–based claims. *See* UCC § 4-102(b), cmt. c ("Specifically the subsection applies to the initial act of a depositary bank in receiving an item **and to the incidents of such receipt.")** (emphasis added).

<u>CLASS ACTION ALLEGATIONS</u>

30.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

---

[1]Virginia and Texas have adopted identical substantive language from UCC § 4-102(b). *Compare* Va. Code § 8.4-102(b*) with* TEX. BUS. & COMM. CODE § 4.102(b).

31.     Plaintiffs file the present action on behalf of themselves and all others similarly situated, for (1) breach of UCC warranties under Virginia's Commercial Code, (2) money had and received under Virginia common law(3) unjust enrichment under Virginia common law, (4) negligence under Virginia's UCC § 3-406, codified in Va. Code § 8.3A-406 (5) breach of contract under Texas law, (6) breach of Reg CC warranties under federal law, and (7) the return of Plaintiffs' money under Virginia's UCC § 3-418(a), codified in Va. Code § 8.3A-418,  and the Law of Mistake and Restitution under Virginia's UCC § 3-418(a), codified in Va. Code § 8.3A-418(a) stemming from NFCU's actions. In addition to damages for the Class, this action seeks attorneys' fees, costs, interest, and any and all other relief to which Plaintiffs show themselves and the Class to be justly entitled.

32.     Plaintiffs propose the following Class definition:

> All banks and bank customers (1) within the United States and its territories (2) who have suffered financial loss as a result of check fraud facilitated by Navy Federal Credit Union, (3) from January 10, 2022 to the present.

33.     Plaintiffs propose the following Texas Subclass definition:

> All banks and bank customers (1) within the State of Texas, (2) who have suffered financial loss as a result of check fraud facilitated by Navy Federal Credit Union, (3) from January 10, 2022 to the present.

34.     Excluded from the Class are Defendant as well as its agents and employees, Plaintiffs' attorneys and their employees, the Judge to whom the action is assigned as well as any member of the Judge's staff and immediate family.

35.     Numerosity: the Class is so numerous that joinder of all members of the Class is impractical. The precise size of the Class is unknown to Plaintiffs at this time, but is believed to be more than 100. The precise Class number and the identities of Class Members may be ascertained from NFCU's records.

36.    Commonality: there is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common factual and legal questions include without limitation:

a.   Whether NFCU has sufficient policies, practices and procedures for opening new Business Accounts to prevent the opening of fraudulent Business Accounts.

b.   Whether NFCU's policy, practice and procedure of warranting through negotiation and/or by allowing the deposit of stolen checks into fraudulently opened NFCU Business Accounts that all endorsements on checks are authentic and authorized and NFCU customers are entitled to enforce the checks constitutes a breach of UCC warranties.

c.   Whether NFCU's policy, practice and procedure of crediting money to the wrong person or account based on mistaken or fraudulent checks establishes a UCC § 3-118(g) money had and received claim.

d.   Whether NFCU's policy, practice and procedure of wrongly benefiting from mistaken or fraudulent checks constitutes unjust enrichment for conversion of funds.

e.   Whether NFCU's policy, practice and procedure of opening accounts that are used to conduct money laundering and/or check fraud establishes that NFCU assisted and/or participated in the negotiation of checks and in the disbursement of funds to unauthorized parties which caused substantial damages to Class Members.

f.   Whether NFCU's intentional disregard or negligent disregard for compliance with applicable KYC and AML rules and regulations caused charges to maker's banks and/or their customers.

g.   Whether NFCU's policy, practice and procedure or allowing its customers to disburse stolen proceeds under suspicious circumstances establishes that NFCU violated UCC § 3-406 resulting in substantial harm to Class Members.

h.   Whether NFCU's policy, practice and procedure which allows its customers to conduct check fraud through failing to create and/or enforce proper safeguards violated UCC § 3-406 resulting in substantial harm to Class Members.

i.   Whether NFCU's policy, practice and procedure that allows its customers to conduct check fraud through failing to create and/or enforce proper safeguards constitutes a breach of NFCU's duties under established banking procedures and norms, including those outlined by the Federal Financial Institutions Examination Council.

j.   Whether NFCU's policy, practice and procedure of not paying funds to the true intended payee constitutes breach of the contract created by the negotiation of each check.

k.   Whether NFCU's acceptance of fraudulent checks violates its duty to exercise ordinary care and follow the rules and guidelines for check acceptance, constituting a breach of warranty under the UCC and/or Regulation CC.

l.   Whether NFCU could have provided additional safeguards to prevent its customers from perpetrating check fraud schemes as alleged in this Complaint.

m. Whether NFCU policies, practices and procedures result in unlawfully declining valid claims for reimbursement from drawee banks, businesses, and individuals.

n. Whether NFCU policies, practices and procedures fail to comply with applicable KYC rules that would otherwise prevent unusual or suspicious account activities and disbursements.

37.    Typicality: Plaintiffs' claims are typical of the proposed Class because all members have been subjected to NFCU's policies, practices and procedures related to the opening of fraudulent accounts at NFCU, acceptance of checks that should not have been accepted, allowance of NFCU customers to conduct check fraud, and refusal to return monies improperly obtained.

38.    Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. Plaintiffs do not have any interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel competent and experienced in complex litigation of this type.

39.    Common questions of law and fact with respect to liability issues, relief issues, and anticipated affirmative defenses predominate over any questions affecting only the individual members of the Class. NFCU subjected Plaintiffs and the members of the proposed Class to the same NFCU policies, practices and procedures related to opening accounts and accepting checks under circumstances that contradict established banking requirements, in violation of Plaintiffs' and Class Members' rights.

40.    A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class Members in individually controlling the prosecution of separate claims against NFCU is small. In addition, Class adjudication will conserve judicial resources and

will avoid the possibility of inconsistent rulings. Individualized litigation increases the expense and delay to all parties and the court system. By contrast, class adjudication presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**JURISDICTION AND VENUE**

41.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiffs are citizens of states different from Defendant.

42.    The Court has personal jurisdiction over NFCU because, through its business of banking in this District, NFCU has established sufficient contacts in this District such that personal jurisdiction is appropriate.

43.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Specifically, for example, money was improperly withdrawn from a Buckholts customer's account as a result of check fraud, Buckholts attempted to recover the funds through banking claims procedures, and Buckholts has suffered loss as a result of NFCU rejecting Buckholts's claim.

**CAUSES OF ACTION**

I.    **BREACH OF UCC WARRANTIES §§ 4-207 AND 4-208**

44.    In accordance with UCC §4-207, codified in Va. Code § 8.4-207.1, NFCU, as an endorser and/or transferor of each check in dispute, warranted to Plaintiffs that NFCU's customers were authorized to enforce the item, and that the proper endorsements had been obtained on each check.

12

45.    Each check was paid over to NFCU even though NFCU was not authorized to enforce the check. Section 4-207 of the UCC provides in part that:

- A customer or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and any subsequent collecting bank that:

- the warrantor is a person entitled to enforce the item;

- all signatures on the item are authentic and authorized;

- the item has not been altered;

* * * *

(c)    A person to whom the warranties under subsection (a) are made and who took the instrument in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach.

(d)    The warranties stated in subsection (a) cannot be disclaimed with respect to checks.

Va. Code § 8.4-207.1; *see also*, UCC §§§ 3-416, 3-417 and 4-208.

46.    Relevant sections of Section 4-208, codified in Va. Code § 8.4-207.2, of the UCC state:

(a) If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that:

(1) the warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft;

(2) the draft has not been altered; and

(3) the warrantor has no knowledge that the signature of the purported drawer of the draft is unauthorized.

(b) A drawee making payment may recover from a warrantor damages for breach of warranty equal to the amount paid by the

13

drawee less the amount the drawee received or is entitled to receive from the drawer because of the payment. In addition, the drawee is entitled to compensation for expenses and loss of interest resulting from the breach. The right of the drawee to recover damages under this subsection is not affected by any failure of the drawee to exercise ordinary care in making payment. If the drawee accepts the draft, breach of warranty is a defense to the obligation of the acceptor. If the acceptor makes payment with respect to the draft, the acceptor is entitled to recover from a warrantor for breach of warranty the amounts stated in this subsection.

(d) If (i) a dishonored draft is presented for payment to the drawer or an indorser, or (ii) any other item is presented for payment to a party obliged to pay the item, and the item is paid, the person obtaining payment and a prior transferor of the item warrant to the person making payment in good faith that the warrantor is, or was, at the time the warrantor transferred the item, a person entitled to enforce the item or authorized to obtain payment on behalf of a person entitled to enforce the item. The person making payment may recover from any warrantor for breach of warranty an amount equal to the amount paid plus expenses and loss of interest resulting from the breach.

(e) The warranties stated in Subsections (a) and (d) cannot be disclaimed with respect to checks. Unless notice of a claim for breach of warranty is given to the warrantor within thirty days after the claimant has reason to know of the breach and the identity of the warrantor, the warrantor is discharged to the extent of any loss caused by the delay in giving notice of the claim.

Va. Code § 8.4-207.2.

47.    In other words, by virtue of NFCU's transfer and presentment of each check to Plaintiffs, NFCU warranted that it was entitled to enforce the item and all signatures were authentic and authorized, that each check was properly negotiated with proper signatures and warranties, and that each check was not altered. Therefore, if a fact finder determines that any check was improperly negotiated because a check was altered,[2] the endorsements were forged or

---

[2] Under Reg CC, if Defendant has not produced each original check for inspection, it is presumed to be altered. *See* 12 CFR § 229.38.

unauthorized, and/or that the proper endorsements were missing (or NFCU was not entitled to enforce the items), NFCU will be held liable for all damages sustained as a result of the breach of warranty up to the face amount of each check, plus any lost interest and all consequential damages, including attorneys' fees and expenses incurred in connection with prosecution of the claims associated with NFCU's transfer and presentment of each check.

48.     NFCU warranted to Plaintiffs and the Class that all endorsements on each check transferred and presented were authentic and authorized, and the depositor was entitled to enforce each item. Each account at NFCU and each check was fraudulent, so NFCU violated the warranty that all signatures on the item were authentic and authorized. NFCU's customers were not authorized to enforce each item. Thus, NFCU is obligated to pay the amount equal to the loss suffered as a result of the breach of warranty as to each check, plus expenses and loss of interest incurred as a result of the breach as set forth in the UCC. *See e.g., C&N Contractors, Inc. v. Community Bancshares, Inc*., 646 So.2d 1357, 1360 (Ala. 1994) ("Liability on the basis of breach of warranty travels backward through the chain of collection and is ultimately placed on the party who took the check from the forger.").

49.     In other words, NFCU allowed the opening of fraudulent accounts, accepted for deposit and then negotiated and presented each check. NFCU transferred and/or presented each check for payment, thereby making the presentment and/or transfer warranties set forth in the UCC and causing Plaintiffs and the Class to suffer damages.

## II.     UCC § 3-118(G) MONEY HAD AND RECEIVED CLAIMS

50.     NFCU is liable to Plaintiffs and the Class for money had and received. Such a claim is expressly permitted by UCC § 3-118(g), codified in Va. Code § 8.3A-118(g). Under Virginia law, an "assumpsit for money had and received" lies when "one person has in his hands money equitably belonging to another." *John C. Holland Enters., Inc. v. J.P. Mascaro & Sons, Inc.*, 653

F. Supp. 1242, 1246 (E.D. Va. 1987) (quoting 2A Michie's Jurisprudence, Assumpsit § 17)). Here, NFCU has money that belongs to Plaintiffs. Moreover, Plaintiffs and NFCU have either (1) an express contract in fact and privity in fact between the parties; (2) an implied contract in fact and privity between the parties: or (3) an implied contract in law and no privity in fact, but an implied privity in law between the parties. *See City of Norfolk v. Norfolk County*, 120 Va. 356, 91 S.E. 820, 821 (1917) (Virginia courts have allowed recovery in a money had and received claim in these three classes of cases).

51.    Additionally, where multiple states have adopted materially identical versions of the UCC, the Virginia Supreme Court has applied the same analysis and reached the same conclusion regardless of which state law technically applies. *Stahl v. Stitt*, 301 Va. 1, 9, 869 S.E.2d 55, 59 (2022) (although West Virginia's version of UCC § 4-302, W. Va. Code § 46-4-302, applied the court's analysis and conclusion would be the same under Virginia's version of UCC § 4-302, Va. Code § 9.4-302, as the statutes are nearly identical). Here, the codified versions of UCC § 3-118(g) in Virginia, Vir. Code § 8.3A-118(g), and in Texas, Tex. Bus. & Comm. Code 3.118 (g), are materially identical. The differences between the two statutes are matters of form, not substance. *Compare* Va. Code § 8.3A-118(g) (using a (i)-(iii) subsection numbering) *with* Tex. Bus. & Comm. Code 3.118 ((g) using (1)-(3) subsection numbering)). Thus, Texas money had and received caselaw is relevant to Plaintiffs' claims.

52.    In Texas, the only thing that needs to be proved in a claim for money had and received "is that defendant holds money which in equity and good conscience belongs to [the plaintiff]." *London v. London*, 192 S.W.3d 6, 13 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (quoting *Staats v. Miller*, 243 S.W.2d 686, 687–88 (1951)). Money had and received "is an equitable doctrine that courts apply to prevent unjust enrichment." *Id.* (*citing Miller-Rogaska,*

*Inc. v. Bank One*, 931 S.W.2d 655, 662 (Tex. App.—Dallas 1996, no writ). "The cause of action is not premised on wrongdoing but looks to the justice of the case and inquires whether the party has received money that rightfully belongs to another." *Id.* (citing *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ). The question in an action for money had and received is to which party the money, in equity and law, belongs. *Id.* (citing *Staats*, 243 S.W.2d at 687). Here, Defendant holds money or held money, which in equity and good conscience belongs to Plaintiffs.

53.    Courts have held that claims for money had and received were recoverable where payment was made based on mistake, fraud, or in other similar circumstances. Indeed, courts have allowed restitution for these types of claims in a variety of cases:

> [B]y a defrauded party against the party who committed the fraud, *see Staats*, 243 S.W.2d at 686–88; *Wiseman v. Baylor*, 6 S.W. 743, 743–44 (Tex. 1887); by a party that made an overpayment, *Benson v. Travelers Ins. Co.*, 464 S.W.2d 709, 710–13 (Tex. Civ. App.—Dallas 1971, no writ); and by a party that paid or credited money to the wrong person or account, *see Amoco Prod. Co.*, 946 S.W.2d at 163–65 (payment to wrong person); *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 710–11 (Tex. App.—Corpus Christi 2006, pet. denied) (payment applied to wrong account); *Lyman D. Robinson Family Ltd. P'ship v. McWilliams & Thompson, P.L.L.C.*, 143 S.W.3d 518, 520 (Tex. App.—Dallas 2004, pet. denied) (earnest money released to wrong client).

*Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837–38 (Tex. App.—Dallas 2008, pet. denied).

54.    In *Benson* for example, the court explained, "[i]t has been stated as a rule of law that if payments were made because of a serious mistake of fact by the insurer, it is entitled to restitution unless it has agreed to assume the risk of mistake or there is some reason which makes it inequitable or inexpedient for restitution to be granted." *Benson v. Travelers Ins. Co.*, 464 S.W.2d 709, 712–13 (Tex. Civ. App.—Dallas 1971, no writ) ("numerous cases throughout the United States are cited in support of this general principle of law."). Accordingly, the court held

that the plaintiff was entitled to recover on its claim for overpayment by mistake, even though the mistake was unilateral and not induced by fraud, imposition, undue influence, or betrayal of confidence. *Id.* at 710–13.

55.    NFCU facilitated check fraud; it should not have received the funds from Plaintiffs and the Class, and should not have released funds received from Plaintiffs and the Class to its customers. NFCU received funds from each check deposited into a fraudulent NFCU account, and those funds belong to Plaintiffs in equity and good conscience. Simply put, NFCU received funds it should never have received.

56.    Claims for money had and received are specifically incorporated into the UCC, and unjust enrichment is implicitly incorporated as well. Section 3-118(g)(1) of the UCC states "Unless governed by other law regarding claims for indemnity or contribution, the following actions must be commenced within three years after the cause of action accrues: (1) an action for conversion of an instrument, an action for **money had and received**, or like action based on conversion…." (emphasis added). Money had and received is therefore specifically adopted by the UCC, and unjust enrichment is a "like action based on conversion" of funds that is implicitly adopted. Causes of action specifically and implicitly adopted by the UCC cannot also be preempted by the UCC.

## III.    UNJUST ENRICHMENT AND OTHER SIMILAR CLAIMS UNDER UCC § 3-118(G)

57.    NFCU is liable to Plaintiffs and the Class for unjust enrichment. Such a claim is expressly permitted by UCC § 3-118(g), codified in Va. Code § 8.3A-118(g). Under Virginia law, an action for unjust enrichment "will lie whenever one has the money of another which he has no right to retain, but which *ex aequo et bono* he should pay over to that other." *State of Qatar v. First Am. Bank of Va.*, 880 F. Supp. 463, 466 n.4 (E.D. Va. 1995) (quoting 2A Michie's Jurisprudence of Virginia and West Virginia, *Assumpsit* § 17 (1993)). To recover under an unjust enrichment theory, a plaintiff must prove that (i) it had a preexisting right to the money and (ii) that the

defendant should not retain the money. *See City of Norfolk v. Norfolk County*, 120 Va. 356, 91 S.E. 820, 825-26 (Va. 1917); *John C. Holland Enters., Inc. v. J.P. Mascaro & Sons*, 653 F. Supp. 1242, 1246 (E.D. Va. 1987); *Liebau v. Seven Oaks Ltd. Partnership*, 1991 Va. Cir. LEXIS 574, Chancery No. 118066, 1991 WL 834960, at *1 (Va. Cir. Ct. May 9, 1991).

58.    NFCU was unjustly enriched from money that rightfully belongs to Plaintiffs and the Class by refusing to return funds obtained from each check. Plaintiffs had a preexisting right to this money and the doctrine of unjust enrichment applies to address such a situation.

59.    For the reasons detailed in *supra* ¶ 51, Texas unjust enrichment caselaw is relevant to Plaintiffs' claims under Va. Code § 8.3A-118(g), which is materially identical to TEX. BUS. & COMM. CODE 3.118(g), as unjust enrichment is a "like action based on conversion." Va. Code § 8.3A-118(g)(i); TEX. BUS. & COMM. CODE 3.118(g)(1). In Texas, a party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *See Pope v. Garrett,* 211 S.W.2d 559, 560 (Tex. 1948); *Austin v. Duval,* 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied).

60.    Unjust enrichment is a cause of action based upon "the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *Friberg-Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 (Tex. App.—Fort Worth 2006, pet. filed) (quoting *Walker v. Cotter Props., Inc.,* 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)), *rev'd on other grounds,* 240 S.W.3d 869 (Tex. 2007); *Mowbray v. Avery,* 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied); *see also Best Buy Co. v. Barrera,* 214 S.W.3d 66, 73 (Tex. App.—Corpus Christi 2006, pet. filed), *rev'd on other grounds,* 248 S.W.3d 160 (Tex. 2007). Unjust enrichment occurs when a person wrongfully secured a benefit or has passively received one which it would

be unconscionable to retain. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied).

61.     A claim for unjust enrichment requires proof of the following elements: (1) defendant obtained a benefit from Plaintiff by fraud, duress, or taking undue advantage; or (2) when a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *Burlington N. R.R. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), aff'd, 966 S.W.2d 467 (Tex.1998); *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992); *Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 319 (Tex. App.—Tyler 1996, no writ).

62.     Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. Here, NFCU was unjustly enriched when it received funds it should never have received, and it wrongfully obtained the benefit of each check from each Plaintiff and the Class, which gives rise to NFCU's obligation to make restitution payments to Plaintiffs and the Class in the amount of each check.

63.     A party may recover under unjust enrichment when the other party "has obtained a benefit from another by fraud, duress, *or the taking of an undue advantage*." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (emphasis added). "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied)). An action for unjust enrichment is an "equitable principle" and does not require that the defendant committed

20

a wrongful act. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied).

64.     Even if NFCU did not actively participate in the alteration or negotiation of each check, it "wrongfully secured a benefit [the proceeds of the check] or has passively received [the proceeds of the check] which it would be unconscionable to retain." *See Eun Bok Lee*, 411 S.W.3d at 111.

65.     "Unjust enrichment is an equitable principle holding that one who received benefits unjustly should make restitution for those benefits," regardless of whether NFCU engaged in wrongdoing. *Texas Integrated Conveyor Sys. Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied) (citations omitted). "Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Id.* (citation omitted). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from other by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citations omitted).

66.     The Texas Supreme Court is instructive regarding whether Plaintiffs may state an independent claim for unjust enrichment. *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682–86 (Tex. 2000) (upholding trial court's grant of summary judgment on claims for both unjust enrichment and money had and received). Additionally, a Texas appellate court indicated that an independent claim for unjust enrichment may be had. *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 828 (Tex. App.—Dallas 2010, pet. denied) ("As McAfee has not alleged <u>fraud</u>, bad faith, or illegality in the contract, we conclude the trial court did not err in granting Agilysys's motion for summary judgment on McAfee's causes of action for unjust enrichment….") (emphasis added).

67.     NFCU was unjustly enriched by obtaining the amount of each check from Plaintiffs and the Class. Stated differently, NFCU received the amount of each check through the federal banking system, and NFCU then unjustly enriched its customer when it credited the funds into its customer's account and did not prevent the check <u>fraud</u> from occurring. In other words, NFCU was also unjustly enriched because it received funds, and it would be unconscionable to retain them. The funds belong to Plaintiffs and the Class—not NFCU, and NFCU should not be allowed to keep said funds.  NFCU should be required to disgorge all these funds as it would be unjustly enriched if it were allowed to keep these funds.

68.     Additionally, as stated above, "[u]njust enrichment occurs when the person sought to be charged has wrongfully secured a benefit ***or has passively received one which it would be unconscionable to retain***." *Texas Integrated Conveyor Sys. Inc.*, 300 S.W.3d at 367 (emphasis added). Here, NFCU passively received the amount of each check. At a minimum under this theory, to the extent the funds are still at NFCU, then NFCU should be required to give the funds back to Plaintiffs and the Class.

## IV.    NEGLIGENCE CLAIMS

69.     The UCC has several provisions designed to hold financial institutions accountable if they allow check fraud. UCC § 3-406<u>, codified in Va. Code § 8.3A-406,</u> can hold a party responsible for negligence contributing to a forged signature or to the alteration of an instrument. Here, NFCU assisted and/or participated first in allowing the fraudulent account to be opened, then in the negotiation of each check, and further in allowing the suspicious or unusual disbursements of the funds to an unauthorized party, which caused Plaintiffs to suffer substantial damages. NFCU is responsible for the result of this united effort because its breach of duty was a substantial factor in causing the losses Plaintiffs and the Class suffered.

22

70.     NFCU opened accounts that were used to conduct check fraud. NFCU accepted checks it never should have accepted. NFCU violated KYC and AML rules and regulations in failing to monitor the account and stop suspicious and unusual transactions. NFCU's actions in allowing its customers to open Business Accounts and disburse the stolen proceeds under suspicious circumstances facilitated check fraud. By virtue of the acts and conduct of NFCU, Plaintiffs suffered damages. The losses sustained by Plaintiffs were made possible because of NFCU's disregard of its own internal documentation and existing federal law including applicable AML/BSA[3] regulations.

71.     It is a fundamental tenet of banking that banks are required to know their customers and understand their customers' banking behavior. *See* 31 C.F.R. §§ 1020.220(a)(1) and (2). This provision is commonly referred to as the "Know Your Customer" or "KYC" Rule. Because the KYC Rule is applicable to federally chartered financial institutions, NFCU is required to collect information about the holder of each account. As part of that process, when an account is opened with NFCU, its employees are required to obtain information concerning the individuals who control the account along with such other information as may be required to confirm that the signatories to the account are, in fact, authorized to act in the manner proposed through the account.

72.     NFCU is required to develop, administer, and maintain a program to ensure compliance with federal Anti-Money Laundering ("AML") laws. *See, e.g.,* 12 C.F.R. § 21.21. The program is to be approved by the financial institution's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the

---

[3]     AML/BSA laws refer to the collective federal anti-money laundering laws and regulations including but not limited to 12 C.F.R. § 21.11, 12 C.F.R. § 21.21, 31 C.F.R. § 1010, 31 C.F.R. § 1020.

financial institution's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

73.    The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. NFCU receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry. There are many other "red flags" for fraud, and examples of these suspicious indicia relevant to the banking activities at NFCU include:

a.    The funds transfer activity is unexplained, suspicious, or shows unusual patterns.

b.    A large volume of ... funds transfers are deposited into ... an account when the nature of the accountholder's business would not appear to justify such activity.

c.    Money is deposited into an account and quickly moved or transferred elsewhere.

d.    A large amount of money is deposited into a new account.

e.    Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.

f.    Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank.

g.    A large number of incoming or outgoing funds transfers take place through a Business Account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations.

h.  Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose.

i.  Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the purported true customer's operations.

j.  Funds are sent or received via international transfers from or to higher-risk locations.

74.     Here, new NFCU Business Accounts were opened and used to commit check fraud. Consistent with FFIEC guidance, NFCU should maintain a system of controls sufficient to identify patterns of account activity, particularly activity between NFCU accounts. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, can be examined through this system. NFCU should have procedures in place to analyze suspicious activity against the backdrop of industry norms and each customer's background. Pursuant to the FFIEC guidelines, NFCU is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to determine the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

75.     According to established banking norms and requirements, NFCU should collect and maintain information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and check fraud. NFCU should also maintain procedures to know the identity of each customer as required by 31 C.F.R. § 1020.220(a)(1), and to collect information about the holder of each account as required by 31 C.F.R. § 1020.220(a)(2). When an entity, rather than an individual opens an account, NFCU should obtain information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that NFCU should collect about new Business Account customers includes the purpose and nature

of the business, anticipated activity in the account, where the customer expects to transact business, and the products and services commonly used by the customer. In the case of Business Accounts, NFCU should ascertain the actual authority of the person to act. Again, in this case, NFCU customers are opening fraudulent NFCU accounts and using those accounts to conduct check fraud to take money from innocent downstream banks like Plaintiffs and other members of the proposed Class. NFCU should also not be allowing suspicious disbursements out of accounts that occur when fraudsters try to rapidly deplete the funds credited in the fraudulent accounts to obtain the stolen funds.

76.     Under established banking procedures, NFCU is expected to create an initial client profile using the information collected, along with the other resources available to it like internet search engines and public and commercial record databases and assign a compliance-related risk rating. Neither the profile nor the risk rating are fixed; these remain subject to change based upon the actual activity in the account and updates or changes in the member profile. When NFCU becomes aware that customer information has materially changed, its internal controls should require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the credit union should become aware of such changes is when the customer's transactions appear inconsistent with the credit union's understanding of the nature and purpose of the account. The credit union may also become aware through direct notification events from governmental authorities and other financial institutions.

77.     Under applicable federal regulations, NFCU is also required to maintain internal controls to ensure ongoing compliance with federal AML laws. These include independent testing of the credit union's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money

laundering. Through these programs, NFCU obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, through compliance NFCU can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

78.    Before NFCU credits a large check, multiple credit union personnel should review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payer, the payee (*i.e.*, the customer), and the depositor. When these efforts detect unusual activity, employees are supposed to examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or who have worked on the account. Various branch-level personnel should also regularly review Balance Fluctuation Reports. These reports should highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

79.    As a direct and proximate result of the breach by NFCU of the duties flowing from these established banking norms and requirements, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

## V.    BREACH OF CONTRACT UNDER TEXAS COMMON LAW

80.    NFCU is liable to Plaintiffs and the Texas Subclass for breach of contract. Plaintiffs are financial institutions incorporated in and doing business in the State of Texas. The financial injuries suffered by Plaintiffs because of NFCU's credit denials occurred in Texas. More specifically, NFCU's payment denial correspondence was received by Plaintiffs **in Texas**. Thus, the relationship between NFCU and Plaintiffs is most centered in Texas and Texas has the "most significant relationship" to a breach of contract claim. *Torrington v. Stutzman,* 46 S.W.3d 829, 848

(Tex. 2000) ("Texas uses the Restatement's 'most significant relationship' test to decide choice-of-law issues."); *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979); RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971). Accordingly, Plaintiffs may assert a breach of contract claim under Texas common law.

81.     The Texas Supreme Court has held that a check is a contract. *See 1/2 Price Checks Cashed v. United Automobile Insurance Co.*, 344 S.W.3d 378, 387 (Tex. 2011) (treating holder's suit to recover for the amount of a check as sounding in contract).  When NFCU accepted for deposit and/or negotiated and paid on each check, it contracted by acknowledging, even embracing, its status as a holder of each check.  *See, e.g., Howard Indus., Inc. v. Crown Cork & Seal Co., LLC*, 403 S.W.3d 347, 350–51 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also 1/2 Price Checks, supra; Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008) (discussing article 2 express warranty).

82.     Because each check is considered to be a contract under Texas law, NFCU must be held to the terms of that contract in that NFCU was required to pay the money to either the true payee who was entitled to the money or return it to the maker of the check.  NFCU also needs to be held to the terms of the contract that each check was properly payable.

83.     A party may succeed on its breach of contract claim when they plead and prove the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach."  *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.).

84.     "The first element in a breach of contract case is that plaintiff must prove the existence of a valid contract wherein the defendant promised to perform in the manner the plaintiff alleges he failed to perform."  *Villarreal v. Art Inst. of Hous., Inc.*, 20 S.W.3d 792, 798 (Tex. App.—Corpus Christi 2000, no pet.) (emphasis added).  Here, each check is considered to be a valid contract between each Plaintiff and NFCU.  *½ Price Checks Cashed v. United Automobile Insurance Co.*, 344 SW 3d 378 (Tex. 2011).

85.     The second element to breach of contract is performance.  Performance by Plaintiffs and the Class was paying NFCU the amount of each check. *Id.*

86.     Here, NFCU breached the check contracts by receiving funds from Plaintiffs that were not supposed to go to NFCU. *Id.* NFCU breached the contract by allowing the improper negotiation of each check.

87.     Plaintiffs must also plead and prove that the damages they claim to have suffered were the "result of" the alleged breach.  *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.); *Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 898 (Tex. App.—San Antonio 2002, no pet.).  Specifically, the evidence must show that the damages are the "natural, probable, and foreseeable consequence" of the defendant's conduct. *Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 396–97 (Tex. App.—El Paso 1998, pet. denied) (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981); *Winograd v. Clear Lake City Water Authority,* 811 S.W.2d 147, 156 (Tex. App.—Houston [1st Dist.] 1991, writ denied)).  Here, because NFCU received funds from Plaintiffs that were not supposed to go to NFCU, and NFCU did not pay the money either the true payee who was entitled to the money or return it upon request, Plaintiffs and the Texas Subclass have suffered damages in the amount of each check.

## VI.   CLAIMS UNDER REGULATION CC WARRANTIES AND MISTAKE AND RESTITUTION UNDER UCC §3-418(A)

88.   Regulation CC outlines specific requirements and obligations related to check collection and warranties.   Specifically, Section 229-34 (12 C.F.R. § 229.34) governs the warranties made by financial institutions when they accept checks.   12 C.F.R. § 229.38 stipulates that financial institutions are required to exercise ordinary care and follow the rules and guidelines for check acceptance.   NFCU's acceptance of each Check constituted a breach of warranty and breach of ordinary care under Regulation CC.   *See* 12 C.F.R. § 229.34; 229.38. NFCU's failure to follow KYC and AML rules and regulations contributed to losses sustained by Plaintiffs and the Class.

89.   NFCU may try to claim that checks were not altered and/or that its customers properly endorsed each check and that it properly transferred and presented the checks to Plaintiffs and the Class, but the maker determines the proper payee. If the drawee of a draft pays or accepts the draft, even if the drawee acted on the mistaken belief that "the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance." UCC § 3-418(a); Va. Code § 8.3A-406(a). Comment 2 to UCC § 3-418(a), codified in Va. Code § 8.3A-418(a), makes this explicit: "If a check has been paid by mistake and the payee receiving payment did not give value for the check or did not change position in reliance on the payment, the drawee bank is entitled to recover the amount of the check under subsection (a) regardless of how the check was paid." UCC § 3-418, cmt. 2.

90.   Even if it is determined that Plaintiffs "mistakenly" paid NFCU, then NFCU still holds each Plaintiff's "mistaken" payment, and Plaintiffs are entitled to recover from NFCU. Under those pleaded facts, and if some payment was recovered in certain cases, the UCC deems

NFCU not to have paid the instrument at all.[4]  NFCU cannot retain each Plaintiff's payment as it would not be a holder in due course,[5] and must return the money withdrawn from Plaintiffs and the Class under Va. Code § 8.3A-406(a).

91.    The UCC's presentment and transfer warranties under Sections 3-416 and 3-417, and its recovery limitations in Section 3-418, all represent a loss-allocation scheme.[6]  In the case of money recovered by NFCU from Plaintiffs, NFCU has suffered no loss and taken nothing "for value."  Rather, it holds each Plaintiff's recovered money to NFCU's benefit and Plaintiffs' detriment.  With respect to the recovered portion of the fraudulent check amounts, NFCU must return Plaintiffs' payments. When NFCU does not return the money upon request, NFCU has benefitted from the fraud, converted[7] the money in violation of the recoveries permitted by UCC § 3-418, and thus is liable to Plaintiffs and the Class.

## VII.    NFCU'S EXPECTED PREEMPTION ARGUMENT FAILS AS A MATTER OF LAW.

92.    On information and belief, NFCU plans to argue that Plaintiffs' claims are preempted by the UCC. However, Plaintiffs' money had and received claim and similar conversion claims are specifically referenced in the UCC, and Plaintiffs' claim for unjust enrichment is a "like action based on conversion" as described in the UCC. Causes of action expressly and implicitly

---

[4]  By analogy to UCC § 3-418(d):  "[When] acceptor recovers payment or revokes acceptance . . . the instrument is deemed not to have been paid or accepted." Just as, under 3-418(d), a drawee bank may not claim it has paid an instrument after recovering money it has paid by mistake, neither should a depositary bank be permitted to claim it has paid an instrument after recovering the money it paid.

[5]  UCC § 3-302(a)(2). A holder in due course "took the instrument (i) for value, (ii) in good faith . . . ."

[6]  *Perini Corp. v. First Nat'l Bank*, 553 F.2d 398, 403 (5th Cir. 1977); *Sw. Bank v. Info. Support Concepts, Inc*., 149 S.W.3d 104, 111 (Tex. 2004).

[7]    *See Quilling v. Compass Bank*, No. 3:03-CV-2180-R, 2004 U.S. Dist. LEXIS 18811, at *22 (N.D. Tex. 2004) (holding that the final payment rule as amended in 1995 does not bar a claim for conversion).  Elements of conversion: "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights."  *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts*, 300 S.W.3d 348, 365 (Tex. App.—Dallas 2009, pet. denied).

adopted by the UCC cannot also be preempted by the UCC. Therefore, these claims are not preempted by the UCC.

93.     Three sources of law permit Plaintiffs' claims for money had and received, conversion, and unjust enrichment. The first is UCC § 3-118(g), codified in Va. Code § 8.3A-118(g) and TEX. BUS. & COMM. CODE 3.118 (g), which specifically states that money had and received claims, as well as conversion claims, are permitted by the UCC: "Unless governed by other law regarding claims for indemnity or contribution, the following actions must be commenced within three years after the cause of action accrues: (1) an action for **conversion** of an instrument, **an action for money had and received**, or like action based on conversion . . . ." UCC § 3-118(g)(1) (emphasis added). These claims are therefore expressly allowed by the UCC.

94.     The comments to UCC § 3-118(g) state it "covers warranty and conversion cases and other actions to enforce obligations or rights arising under Article 3." UCC § 3-118, cmt. 6. Thus, the UCC contemplates that warranty actions, claims for conversion, and "other actions" are subject to the same limitation period. The use of the plural is important because it shows that other common law claims are permitted by the UCC even though only money had and received and conversion are specifically mentioned in the statute. Unjust enrichment is a claim that is a "like action based on conversion" as described in § 3-118(g). Money had and received and unjust enrichment are closely linked as money had and received "belongs conceptually to the doctrine of unjust enrichment;"[8] which is why the elements for each claim are very similar.[9] Likewise, unjust

---

[8] *Lawyers Title Co. v. J.G. Cooper Dev., Inc*., 424 S.W.3d 713, 721 (Tex. App.—Dallas 2014, pet. denied).
[9] *See MGA Ins. Co. v. Charles R. Chesnutt, P.C.,* 358 S.W.3d 808, 814 (Tex. App.–Dallas 2012, no pet.)("To prove a claim for money had and received, a plaintiff must show that (1) a defendant holds money (2) which in equity and good conscience belongs to the plaintiff."); *see also Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992) ("A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.")

enrichment and conversion are closely linked in that "a conversion should not unjustly enrich the wrongdoer…."[10] In other words, one who converts property has been unjustly enriched in the amount of the property converted. Therefore, unjust enrichment is a "like action based on conversion . . . ." pursuant to § 3-118(g) that is subject to the statute of limitations listed therein.

95.     The second source of law that permits these claims is UCC § 1-103, codified in Va. Code § 8.1A-103 and TEX. BUS. & COMM. CODE § 1.103. As an initial matter, when it "is not clear from the text that Congress intended to supersede state law (including state common law duties) there is a presumption against preemption."[11] Here, the presumption against preemption is even stronger because UCC § 1-103 shows the Texas and Virginia legislatures intended that the UCC be "liberally construed" such that "the principles of law and equity" can "supplement… provisions [of the UCC]."[12] Va. Code § 8.1A-103; TEX. BUS. & COMM. CODE § 1.103. As the comments to the UCC note, "[t]he UCC was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to **supplement** it[s] provisions in many important ways."[13] A holding that all of Plaintiffs' claims are barred by the doctrine of preemption would contradict Section 1-103(b) of the UCC; obviously common law claims cannot "supplement" UCC provisions (as the UCC requires) if they are preempted.

96.                 Finally, case law also shows that Plaintiffs' claims are not preempted by the UCC. Under Virginia law, common-law claims are displaced by the UCC only where a particular provision of the Virginia Commercial Code comprehensively governs the same subject matter. *See Stefano v. First Union Nat'l Bank of Virginia*, 981 F. Supp. 417 (E.D. Va.

---

[10] *Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C*., 360 S.W.3d 691, 706 (Tex. App.—Dallas 2012, no pet.)
[11] *Mills v. Warner-Lambert Co*., 581 F.Supp.2d 772, 780 (E.D. Tex. 2008).
[12] Tex. Bus. & Com. Code § 1.103(b).
[13] *Id.* at cmt. 2 (emphasis added).

1997) (holding that Virginia Code § 8.3A-420 displaced a common law conversion claim); *Halifax Corp. v. Wachovia Bank, 268 Va. 641, 657,* 604 S.E.2d 402 (2004) (the Virginia Supreme Court agreeing with "the *Stefano* court's 'standard for Code displacement of the common law[.]'"). Unlike Va. Code §§ 8.4-207.1 and 8.4-207.2, which comprehensively govern transfer and presentment warranties, Va. Code § 8.3A-118(g) does not comprehensively govern claims for "money had and received" and a "like action based on conversion." For instance, Va. Code § 8.3A-118(g) does not set forth the elements of a money had and received claim. *See* supra ¶ 50.

97.    The Fifth Circuit has held even an **outright conflict** between a common law claim and the provisions of the UCC was insufficient to displace a common law claim.[14] Case law on these issues confirms that the UCC does not allow for "any inconsistencies and conflicts [to] provide a license to throw the clean baby out with the dirty bathwater."[15] Texas courts have understood that when it "is not clear from the text that Congress intended to supersede State law (including State common law duties) **there is a presumption against preemption**."[16] "Both the Texas Supreme Court and [the Fifth Circuit Court of Appeals] have recognized situations where instead of displacing common law altogether, the UCC modifies the common law."[17]

98.    Noting "Defendants appear to posit that the existence of a Code section that governs bank deposits is sufficient to 'supplant' a claim for money had and received related to certificates of deposit", the court in *Villareal v. First Presidio Bank* held: "This is error. Absent a conflict with a particular provision, common-law principles complement the Uniform Commercial Code."[18]

---

[14] *Coastal Agric. Supply, Inc. v. JP Morgan Navy Federal Credit Union Bank, N.A.*, 759 F.3d 498, 508 (5th Cir. 2014).
[15] *Peerless Ins. Co. v. Tex. Commerce Bank-New Braunfels, N.A.*, 791 F.2d 1177, 1180 (5th Cir. 1986)
[16] *Mills v. Warner-Lambert Co.*, 581 F.Supp.2d 772, 780 (E.D. Tex. 2008) (emphasis added).
[17] *Coastal Agric. Supply, Inc. v. JP Morgan Navy Federal Credit Union Bank, N.A.*, 759 F.3d 498, 507 (5th Cir. 2014).
[18] *Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 554 (W.D. Tex. 2017) (citing Tex. Bus. & Com. Code § 1.103(b)).

Following Fifth Circuit precedent, the court further held that "even an outright conflict between the money-had-and-received claim and the particular provisions of the Texas Business and Commerce Code was insufficient to displace the money-had-and-received claim."[19]

99.    Other courts have arrived at the same conclusion. In *Stone v. First City Bank of Plano, N.A.*, the court held that "the implied contract action for money had and received has survived the [Texas Business and Commerce] Code's adoption."[20] In  *Peerless Inc. Co. v. Tex. Commerce Bank-New Braunfels, N.A.*, the Fifth Circuit held that a common-law action for money had and received was not displaced by Texas' adoption of the UCC.[21] In *Ross v. Bank of Am. N.A.*, the court held "The revised UCC contemplates that actions for money had and received will be available." 693 F. Supp. 2d 692, 696 n. 1(S.D. Tex. 2010)

100.    Section 3-118(g) specifically provides that such claims are subject to a three-year statute of limitation. "The goals of the UCC can be accomplished by tailoring inconsistent common-law remedies to meet the UCC requirements."[22] Therefore, the operative issue becomes whether there is any way that a conflict between common law and the UCC can be resolved without entirely displacing the common law claims.[23] Plaintiffs' claims should therefore be viewed in a way that accounts for UCC defenses, but does not eliminate common law claims altogether. However, in this case, NFCU may try to persuade the Court to deviate from the holding in *Ross*

(and the Fifth Circuit's holding in *Peerless*), and conclude that the UCC preempts all of

---

[19] *Id.* (citing *Coastal Agric. Supply, Inc. v. JP Morgan Navy Federal Credit Union Bank, N.A.*, 759 F.3d 498, 508 (5th Cir. 2014).

[20] *Stone v. First City Bank of Plano, N.A.*, 794 S.W.2d 537, 543 (Tex. App. 1990)

[21] *Peerless Ins. Co. v. Tex. Commerce Bank–New Braunfels, N.A.*, 791 F.2d 1177, 1180 (5th Cir. 1986).

[22] *Ross v. Bank of Am. N.A.*, 693 F.Supp.2d 692, 696 n.1 (S.D. Tex. 2010).

[23] *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.,* 759 F.3d 498, 508 (5th Cir. 2014) ("Here, the conflict between the money had and received claim at common law and § 3.405 can be resolved without entirely displacing the money had and received claim. Rather, the money had and received claim as applied in this situation must simply incorporate the affirmative defense provided by § 3.405.").

Plaintiffs' common law claims, rather than "modify" Plaintiffs' claims "to incorporate any limits set in the UCC."[24] This would be error. Plaintiffs' claims are limited by the UCC but supplement the UCC.

## VII.   PLAINTIFFS ARE ENTITLED TO RECEIVE THEIR ATTORNEYS' FEES, COSTS, AND EXPENSES.

101.    Plaintiffs should be awarded attorneys' fees, costs, and expenses incurred in having to bring this lawsuit. NFCU breached warranties and breached the contractual obligations imposed by the checks. Plaintiffs therefore seek such amounts as reasonable and necessary attorneys' fees incurred in this matter, plus additional fees and costs, including appellate fees and costs.

102.    Various cases allow attorneys' fees under transfer and/or presentment warranties. *See, e.g., First Virginia Bank-Colonial v. Provident State Bank*, 38 UCC Rep. Serv. 561, 582 F. Supp. 850 (D. Md. 1984); *First Nat'l Bank of Neenah v. Security Nat'l Bank of Springfield,* 32 UCC Rep. Serv. 926 (D. Mass. 1981); *Southern Provisions, Inc. v. Harris Trust & Savings Bank*, 31 UCC Rep. Serv. 640, 96 Ill. App. 3d 745, 422 N.E.2d 33 (1981). Thus, Plaintiffs seeks to recover its attorneys' fees, costs, and expenses on this ground as well.

103.    The Fifth Circuit Court of Appeals has held that UCC § 4-207 includes attorneys' fees in the amount recoverable by a bank to which the transfer warranty runs.  *See Perkins State Bank v. Connolly*, 632 F.2d 1306, 1315 (5th Cir. 1980). In *Perkins State Bank*, Hanover Bank brought a breach of transfer warranty counterclaim and was entitled to receive the attorneys' fees spent in defense of the claim as an element of damages.  *Id*. at 1316. Hanover Bank had issued a cashier's check that was fraudulently endorsed and deposited into a trust account at Perkins State Bank.  *Id*. at 1308. Perkins State Bank was found to be liable to Hanover for a breach of Florida's UCC § 4-207 transfer of warranty. The court read Section 4-207 to establish a right of indemnity

---

[24] *Id*.

under state law. *Id*. at 1315. The court based its reasoning on an 8th Circuit Court of Appeals decision which found that attorneys' fees incurred in defense of the claim are a part of the damages sought in an indemnity action under state law and therefore allowed under § 4-207. *Id*. (citing *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 491 F.2d 192 (8th Cir. 1974)).

104.    Other courts have held that attorneys' fees can be awarded in a suit for breach of transfer warranty in regards to a negotiable instrument under Section 4-207 of the UCC, which provides that attorneys' fees be awarded as expenses in appropriate cases. *Guaranty Bank & Trust Co. v. Federal Reserve Bank of Kansas City*, 454 F. Supp. 488, 492 (W.D. Okla. 1977) (*citing* UCC § 4-207 cmt. 5 (amended 2002)). The court in *Guaranty Bank & Trust Co. v. Federal Reserve Bank of Kansas City* found that it was appropriate to award attorneys' fees as expenses to the payor bank where a collecting bank breached a transfer of warranty when it presented a fraudulent cashier's check to the payor bank. *Id*.; *See also*, *First Virginia Bank-Colonial v. Provident State Bank*, 582 F. Supp. 850, 852 (D. Md. 1984). The court analyzed that Comment 5 to UCC § 4–207 transfer of warranty requires the court to decide whether a particular case is an "appropriate" one for the inclusion of attorneys' fees in the expenses recoverable under UCC § 4–207(3). *Id*. at 852. The court held that when a payor bank must enforce the clear warranty liability of the depositary bank through litigation, the payor bank is entitled to attorneys' fees. *Id*.

### CONDITIONS PRECEDENT

105.    Any and all conditions precedent to Plaintiffs' right to bring this lawsuit and recover from the NFCU have been fully performed by each Plaintiff or have occurred.

### PRAYER

106.    Plaintiffs pray that Defendant be cited to appear and answer by written denial and that the Court grant each Plaintiff Judgment against Defendant as follows:

(a)     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class and Subclass Representatives and appointing the undersigned counsel as Class Counsel;

(b)     For all recoverable actual, special, and/or equitable damages or remedies as are set forth herein and at the time of trial;

(c)     A declaration that Defendant holds the described property and profits as constructive trustees for the benefit of Plaintiffs;

(d)     A declaration that Defendant does not possess or own any interest in the described property;

(e)     Ordering the conveyance of the described property from Defendant to Plaintiffs, free and clear of any and all interests, liens, and claims;

(f)     For pre-judgment and post-judgment interest as provided by law;

(g)     For punitive and exemplary damages;

(h)     For reasonable and necessary attorneys' fees at all stages of trial and appeals; and

(i)     For all such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

## JURY DEMAND

107.    Plaintiffs demand trial by jury on all issues triable of right by a jury.

Dated: February 6, 2026                    Respectfully submitted,


                                           By: _/s/John R. Fabry__
                                                John R. Fabry, Texas Bar No. 06768480
                                                Morgan R. Ferrell, Texas Bar No. 24132044
                                                Philip J. Koelsch, Texas Bar No. 24110103
                                                **THE CARLSON LAW FIRM, P.C.**
                                                559 S. Interstate Hwy 35
                                                Suite 250
                                                Round Rock, TX 78664

Telephone: (512) 671-7277
jfabry@carlsonattorneys.com
mferrell@carlsonattorneys.com

By: /s/Amos L. Barton
Amos L. Barton, Texas Bar No. 24031847
**BARTON LAW FIRM, PLLC**
301 Junction Highway, Suite 100
Kerrville, Texas 78028
Phone: (830) 257-7575
Fax: (830) 257-7580
Amos@amosbarton.com

By: /s/William P. Huttenbach
William P. Huttenbach, Texas Bar No. 24002330
**CRAIN CATON & JAMES**
1401 McKinney, Suite 1700
Houston, Texas 77010
(713) 658-2323 Main
(713) 658-1921 Fax
whuttenbach@craincaton.com

*Attorneys for Plaintiffs and the Proposed Class*

### CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 6, 2026, a copy of the foregoing was filed electronically and served electronically to all parties by operation of the Court's electronic filing system.

/s/John R. Fabry
John R. Fabry